**P.F. PALOS, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Court No. 85–06–00824.**

United States Court of
International Trade.

May 10, 1990.

Grunfeld, Desiderio, Lebowitz & Silverman, (Steven P. Florsheim), New York City, for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, International Trade Field Office, Commercial Litigation Branch (Saul Davis), and (Chi S. Choy, U.S. Customs Service, New York City, of counsel), for defendant.

## MEMORANDUM OPINION
## AND ORDER

RE, Chief Judge:

The question presented in this case pertains to the proper classification, for customs duty purposes, of certain merchandise imported from Brazil and described on the customs invoices as "plastic shoe soles."

The imported merchandise entered at the port of San Juan, Puerto Rico, and was classified by the Customs Service as "[o]ther footwear," under item 700.60 of the Tariff Schedules of the United States (TSUS), dutiable at the rate of 20 per centum *ad valorem*. Plaintiff protests this classification and contends that the imported merchandise is properly classified as "[o]ther footwear ...: [h]aving uppers of which over 90 percent of the exterior surface area is rubber or plastics," under item 700.58, TSUS, dutiable at the rate of 6 per centum *ad valorem*.

The pertinent statutory provisions of the tariff schedules are as follows:

Classified Under:

> Schedule 7, Part 1, Subpart A:
> Footwear (whether or not described elsewhere in this subpart) which is over 50 percent by weight of rubber or plastics or over 50 percent by weight of fibers and rubber or plastics with at least 10 percent by weight being rubber or plastics:

> Other footwear (except footwear having uppers of which over 50 percent of the exterior surface area is leather):

700.60 Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20% *ad val.*
Claimed Under:

> Schedule 7, Part 1, Subpart A:
>> Footwear (whether or not described elsewhere in this subpart) which is over 50 percent by weight of rubber or plastics or over 50 percent by weight of fibers and rubber or plastics with at least 10 percent by weight being rubber or plastics:

>> Other footwear (except footwear having uppers of which over 50 percent of the exterior surface area is leather):
>>> Having *uppers of which over 90 percent of the exterior surface area is rubber or plastics* (except footwear having foxing or a foxing-like band applied or molded at the sole and overlapping the upper):

700.58 Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6% *ad val.*
 (emphasis added)

---

The question presented is whether the imported footwear has been properly classified by the Customs Service as "[o]ther footwear," under item 700.60, TSUS, with duty at the rate of 20 per centum *ad valorem,* or whether it contains "uppers of which over 90 percent of the exterior surface area is rubber or plastics," and, hence, is properly classifiable under item 700.58, TSUS, and dutiable at the rate of 6 per centum *ad valorem,* as claimed by plaintiff. In simple terms, the tariff classification of the imported footwear will differ depending upon whether it contains "uppers."

In order to decide the question presented, the court must consider "whether the government's classification is correct, both independently and in comparison with the importer's alternative." *Jarvis Clark Co. v. United States,* 733 F.2d 873, 878, *reh'g denied,* 739 F.2d 628 (Fed.Cir. 1984). Pursuant to 28 U.S.C. § 2639(a)(1) (1982), the government's classification is presumed to be correct, and the burden of proof is upon the party challenging the classification. *See Jarvis Clark Co.,* 733 F.2d at 876.

Contending that there are no genuine issues of material fact, both parties move for summary judgment pursuant to Rule 56 of the Rules of this court. Based upon the statements of material facts submitted by both parties pursuant to Rule 56(i) of the Rules of this court, the court concludes that there are no genuine issues of material fact.

Upon examining the imported footwear, the pertinent tariff schedules, the relevant case law, lexicographic definitions and the affidavits and motion papers submitted by the parties, it is the holding of the court that the imported footwear has been properly classified by Customs as "[o]ther footwear," under item 700.60, TSUS.

## SUMMARY JUDGMENT

On a motion for summary judgment, it is the function of the court to determine whether there are any factual disputes that are material to the resolution of the action. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). It is fundamental that "[t]he court may not resolve or try factual issues on a motion for summary judgment." *Phone–Mate, Inc. v. United States,* 12 CIT ——, 690 F.Supp. 1048, 1050 (1988), *aff'd,* 867 F.2d 1404 (Fed.Cir.1989). The court, however, may grant a motion

for "summary judgment ... against a party who fails to present sufficient evidence 'to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Liberty Lobby, Inc. v. Rees*, 852 F.2d 595, 598 (D.C.Cir.1988) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)), *cert. denied*, —— U.S. ——, 109 S.Ct. 1118, 103 L.Ed.2d 181 (1989). In ruling on cross-motions for summary judgment, if no genuine issues of material fact exist, the court must determine whether either party "is entitled to a judgment as a matter of law." USCIT R. 56(d).

## BACKGROUND

The imported merchandise consists of a molded piece of semi-rigid clear plastic, in the shape of the sole of a shoe. Two holes are located in the back of the merchandise, and a nib or protrusion of plastic containing a hole, is located in the front. After importation, a lace or thong is attached to the imported merchandise through the two holes located on the back, and the nib in the front. The finished product is a sandal.

According to plaintiff, "[t]he merchandise ... consists of certain footwear referred to as 'Icicles.'" The defendant states "that this footwear is the substantially complete Icicles—in particular the 'sole' or 'bottom' without the thongs which hold the foot to the sole."

In support of its motion, plaintiff contends that "[t]he subject Icicles, in their imported condition, contain uppers which are wholly of plastics, which therefore renders them properly classifiable under TSUS item 700.58." Specifically, plaintiff asserts that "[s]hoe uppers are those portions of the shoe that extend above the sole[,] [and] [s]ince the subject Icicles contain one plastic component which extends above the sole, the articles satisfy the requirements of TSUS item 700.58 and are therefore properly classifiable thereunder." Plaintiff explains that the nib, or protrusion of plastic "is clearly the 'upper.'"

In opposition to plaintiff's motion, and in support of the classification and its cross-motion, defendant contends that "[t]he imported footwear does not contain any upper in its condition as imported." Defendant also contends that "[e]ven if the protrusion of the imported footwear would be considered the upper or part of the upper, it is not the exterior surface of the upper."

## DISCUSSION

 It is basic in customs law that "it is the function of the court to interpret the tariff acts in a manner that will fulfill or carry out the intent of Congress." *Phone–Mate*, 690 F.Supp. at 1051 (citing *Sandoz Chem. Works, Inc. v. United States*, 43 CCPA 152, 156, C.A.D. 623 (1956)). In determining the intent of Congress, "tariff terms are to be construed in accordance with their common and commercial meanings, which are presumed to be the same." *Nippon Kogaku (USA), Inc. v. United States*, 69 CCPA 89, 92, 673 F.2d 380, 382 (1982).

 In support of its assertion that "[s]hoe uppers are those portions of the shoe that extend above the sole[,]" i.e., the nib or protrusion of plastic, plaintiff cites several lexicographic definitions. According to *Webster's Third New International Dictionary of the English Language* 2518 (1986), an "upper" is "the parts of a shoe or boot that are above the sole...." In addition, the *Dictionary of Shoe Industry Terminology*, a trade publication, defines an "upper" as "the top part of the shoe above the sole." Footwear Industries of America, *The Dictionary of Shoe Industry Terminology* (1986).

Plaintiff also notes that the Customs Service has defined an "upper," in the context of ski boots, as "that portion above the outer sole or, where there is no separate upper and outer sole, as in an injection molded plastic ski boot, that portion above the line simulating the point at which the upper and sole join." T.D. 70–238(19), 4 Cust.B. & Dec. 742, 742 (Oct. 15, 1970). More recently, Customs has stated that "for the purposes of computing the exterior surface area of an upper, the upper is everything from just below the insole level." T.D. 81–79, 15 Cust. B. & Dec. 191,

193 (Apr. 8, 1981). Hence, plaintiff asserts that "[i]t is therefore apparent that the common meaning of the term 'uppers' refers to all portions of the footwear that are above the sole."

The defendant, however, disagrees and notes "that decisions of the courts have long treated the thongs as the upper of this type of footwear." In *United States v. Shokai*, 14 Ct.Cust.App. 392, T.D. 42033 (1927), the imported merchandise consisted of wooden clogs. The clogs were described as:

> rectangular blocks of wood, rounded at the corners, flat on the upper side, but grooved and so cut on the under side to serve in a crude manner the purpose of a sole and heel. The clogs have three perforations through the surface, one on each side near the rear, and one in the center near the front. A thong or strap of certain fabric material runs along the upper surface from one of the holes on the rear side to the front hole in the center, and then back to the other rear hole.... [T]he strap on the upper side of the clog has the appearance of an inverted V ... [and] ... serves to catch the toes and so holds the clog on to the foot when in use.

*Id.* at 393. The clogs were classified as "other footwear, the uppers of which are composed wholly or in chief value of wool, cotton, ramie, animal hair, fiber, or silk," under paragraph 1405 of the Tariff Act of 1922. *See id.* Plaintiff protested the classification, and contended that the clogs were properly classifiable "as manufactures in chief value of wood, under paragraph 410." *Id.* The Customs Court sustained plaintiff's protest.

On appeal to the Court of Customs Appeals, the plaintiff contended that the clogs were not properly classifiable under paragraph 1405 because "commercially, in the United States, the fabric portion of these articles were not known as uppers." *Id.* at 395. The appellate court noted that "the sole question in this case is: Are the straps or thongs of fabric 'uppers' within the meaning of the term as used in paragraph 1405 ... ?" *Id.* at 397. The appellate

court answered the question in the affirmative, and reversed.

In reversing, the appellate court stated "that the wooden clog is the sole[,] [and] [t]he thongs or straps above the wood portion cover the foot and hold the sole to the foot." *Id.* The appellate court determined that "that portion of the fabric that extends above the sole, partially covering the foot and holding the sole in place, constitutes an upper within the common meaning of the term...." *Id.* Hence, in reversing the Customs Court, and in sustaining the classification by Customs, the appellate court held that "the common meaning of the term 'uppers' is broad enough to include the straps and thongs in the merchandise at bar." *Id.* at 397.

Similarly, in *United States v. North Am. Mercantile Co.*, 17 Ct.Cust.App. 379, T.D. 43820 (1930), the imported merchandise consisted of straw sandals. The sandals consisted of soles, made of straw and rubber, and attached thongs. *See id.* at 379. The sandals were classified by Customs "as other footwear, the uppers of which were in chief value of cotton, under paragraph 1405 of the Tariff Act of 1922...." *Id.* Plaintiff protested the classification, and contended that the imported merchandise was properly classifiable "as manufactures of straw and rubber," under paragraph 1439. *Id.* The Customs Court sustained plaintiff's protest. *See id.* at 380.

On appeal, the Court of Customs and Patent Appeals reversed on the basis of *Shokai*. The appellate court stated that in *Shokai*, "the footwear consisted of wooden clogs or soles, each with a V-shaped cloth strap, made up similarly to those before us here, above the sole, to hold the clog on the foot[,] [and] [w]e held these cloth straps to be uppers." *Id.* The court concluded that "this case is ruled by *United States v. Shokai*, ... and the judgment of the Customs Court is *reversed.*" *Id.* at 381 (emphasis in original).

In this case, plaintiff submitted samples of the imported footwear, and of the finished footwear. An examination of the samples reveals clearly beyond doubt that the strap or thong, which is attached to the

imported merchandise after importation, serves to hold the sole to the foot of the wearer, in the same manner as the straps or thongs in *Shokai* and *North American Mercantile.* Since the similarity is obvious and cannot be denied, the imported merchandise in this case does not contain an upper.

In customs classification cases it is often stated that "samples of the merchandise may be 'potent' witnesses." *Permagrain Prods., Inc. v. United States,* 9 CIT 426, 429, 623 F.Supp. 1246, 1249 (1985) (citing *Marshall Field & Co. v. United States,* 45 CCPA 72, 81, C.A.D. 676 (1958)), *aff'd,* 791 F.2d 914 (Fed.Cir.1986). An examination of the imported merchandise indicates that the nib or protrusion is not an upper, but rather is part of the sole. The nib is of the same plastic material as the sole, and contains a hole through which the strap or thong is attached to the sole.

In support of the Customs classification, defendant presented the affidavits of Mr. George Langstaff, formerly the executive vice president and general manager of the footwear sector of Genesco, Inc., and Mr. Jacob Barrocas, manufacturing vice president of Injection Footwear Corp. Mr. Langstaff stated that he was "familiar with the type of footwear known and sold as 'Icicles[,]' ... [and] intimately familiar with industry terminology regarding footwear...." Mr. Barrocas stated that he had been "involved with our manufacture of sandals identical to Icicles, ... [and was] intimately familiar with footwear terminology and practice."

In their affidavits, both Mr. Langstaff and Mr. Barrocas stated that "in its condition as imported the footwear does not have an upper, as the industry recognizes that the upper must: (a) enclose the top portion of the foot; (b) hold the foot to the sole; and/or (c) protect the top and sides of the foot." They also stated "that the soles or bottoms of the Icicles are substantially complete footwear, as the addition of the thongs after importation is a minimal operation—merely running the thong through the three holes."

Pursuant to General Interpretative Rule 10(h), Customs has classified the merchandise as "substantially complete" footwear. Rule 10(h) provides that "unless the context requires otherwise, a tariff description for an article covers such article, ... whether finished or not finished...." Case law teaches that "[t]o ascertain whether an article can be classified as unfinished under Rule 10(h), the court must determine if the merchandise is 'substantially complete.'" *Channel Master, Div. of Avnet, Inc. v. United States,* 10 CIT 684, 688, 648 F.Supp. 10, 14 (1986) (citing *Authentic Furniture Prods., Inc. v. United States,* 68 Cust.Ct. 204, 211, C.D. 4362 (1972), *aff'd,* 61 CCPA 5, C.A.D. 1109, 486 F.2d 1062 (1973)), *aff'd,* 856 F.2d 177 (Fed. Cir.1988).

Whether or not imported footwear is "substantially complete" is a question that has been previously litigated. Although the factors that are to be considered in determining whether an importation is "substantially complete" may be easy to articulate, and are set forth in *Daisy–Heddon, Div. Victor Comptometer Corp. v. United States,* 66 CCPA 97, 102, C.A.D. 1228, 600 F.2d 799, 803 (1979), their application to particular importations may not always be free from doubt.

For example, in *Simod Am. Corp. v. United States,* 12 CIT ——, 693 F.Supp. 1172 (1988), *rev'd,* 872 F.2d 1572 (Fed.Cir. 1989), the imported merchandise consisted of shoe uppers containing an "underfoot," a piece of material sewn on the bottom of the upper. The underfoot served to hold the imported footwear onto the lasts of the Desma machine, a machine located at the plaintiff's United States factory which finished the footwear "by the production and addition of soles through a polyurethane injection molding process." 693 F.Supp. at 1175. After the soles were added by the Desma machine, the merchandise was cleaned, labelled, "packaged and put into a condition suitable for retail sale." *Id.* The Customs Service determined that, as imported, the merchandise constituted "substantially complete" footwear, and, therefore, was properly classifiable as "unfinished footwear," since under General In-

terpretative Rule 10(h), "a tariff description for an article covers such article ... whether finished or not finished...." The plaintiff contested the classification, and contended that the imported merchandise was not "substantially complete" unfinished footwear, but consisted only of shoe "uppers."

This court applied the various *Daisy–Heddon* factors, and determined that a greater number of components of the merchandise were added before importation than after, and concluded that, as imported, the footwear was "substantially complete." *See id.* at 1177. This court also noted that the completion of the imported merchandise into footwear, which occurred at the plaintiff's United States factory, was accomplished by the Desma machine, which "produced and attached a sole by making two injections of polyurethane onto the bottom of the imported merchandise." *Id.* The court added that "[i]n contrast to the labor-intensive craftsmanship demonstrated at the Italian stitching rooms [before importation], the [United States] factory procedure was highly industrialized." *Id.* at 1178. On the record evidence, the court determined that plaintiff "expended more time and effort in the production of the shoes into their imported condition than in finishing them at the [United States] factory." *Id.* It was also noted that "[a] viewer of the imported merchandise would immediately recognize it as athletic footwear." *Id.* at 1179. Hence, this court sustained the Customs classification.

On appeal, however, the appellate court discussed the details of the manufacturing process accomplished by the Desma machine, a sophisticated machine costing between $800,000 and $1,000,000, and determined that more time, effort, and money were expended in completing the merchandise after importation. *See* 872 F.2d at 1576–78. In its analysis of the *Daisy–Heddon* factors, the appellate court stated that "the trial court ignored the capital-intensive nature of the [United States] manufacturing plant[,]" and concluded that "[t]he fact that the [United States] operation was largely mechanized does not detract from the substantial nature of the manufacturing efforts undertaken there." *Id.* at 1577.

From its own examination of the imported merchandise, the appellate court observed that "while it clearly is embryo footwear, it is also clearly in the infant stages of manufacture[,]" and that it did not constitute "substantially complete" footwear. *See id.* at 1578. Nonetheless, the appellate court stated that "we are unable on the present record ... to discern what the true classification should have been[,]" and reversed the decision of this court, and remanded. *Id.* at 1578–79. On remand to this court, the case was remanded to the Customs Service for reclassification. *See Simod Am. Corp. v. United States*, 13 CIT ——, Slip Op. 89–72, 1989 WL 56260 (May 25, 1989). On July 18, 1989, the Customs Service reclassified the imported merchandise in accordance with the plaintiff's claimed classifications.

In the present case, however, the sometimes difficult question of determining whether imported footwear is "substantially complete," is not presented since it is conceded that, as imported, the merchandise at issue constitutes "substantially complete" footwear.

In its opposition to defendant's cross-motion, plaintiff maintains that "[d]efendant ... contends that the classification of the subject Icicles must be determined on the basis of their condition after they are completed and ready for sale—that is, with the laces (or thongs) attached." According to plaintiff, "[a]ssuming defendant's theory is sustained, then plaintiff is entitled to partial summary judgment with regard to that portion of the merchandise that was laced with plastic laces after importation."

The imported merchandise, however, pursuant to General Interpretative Rule 10(h), was properly classified in its condition as imported, as "substantially complete" footwear. Hence, plaintiff's alternative argument need not be discussed.

## CONCLUSION

In view of the foregoing, it is the determination of the court that there are no genuine issues of material fact, and that

plaintiff has not overcome the presumption of correctness that attaches to the classification by Customs. Hence, since the imported merchandise was properly classified by Customs as "[o]ther footwear," under item 700.60, TSUS, with duty assessed at the rate of 20 per centum *ad valorem*, plaintiff's motion for summary judgment is denied, and defendant's cross-motion for summary judgment is granted.